UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 14-10363-RGS

UNITED STATES OF AMERICA

v.

GENE SVIRSKIY

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL
OR, ALTERNATIVELY, A NEW TRIAL

April 12, 2019

STEARNS, D.J.

After a ten-week trial and six days of deliberations, a jury convicted defendant Gene Svirskiy of racketeering under the Racketeer Influenced and Corrupt Organizations (RICO) statute, RICO conspiracy, ten counts of mail fraud, and two counts of introducing adulterated or misbranded drugs into interstate commerce in violation of the federal Food, Drug, and Cosmetic Act (FDCA).[1] The charges and subsequent convictions arose out of Svirskiy's role as a "Clean Room" pharmacist at the New England Compounding Center (NECC). NECC came under intense investigative scrutiny in 2012 after three fungal-contaminated batches of injectable methylprednisolone acetate

---

[1] He was found not guilty on two other counts of mail fraud (Counts 32 and 47).

(MPA) it compounded and shipped led to a widespread outbreak of fungal meningitis. Scores of patients died and hundreds more were grievously injured. Svirskiy was indicted together with several coworkers and the principals of NECC, although not any charge connected to the contaminated MPA. The court severed the cases of the two defendants charged with murder racketeering from the cases involving lower-level employees charged with lesser offenses. Svirskiy was tried with this latter group.

Svirskiy has now moved post-verdict for a judgment of acquittal under Fed. R. Crim. P. 29, or, in the alternative, for a new trial under Fed. R. Crim. P. 33. The centerpiece of his Rule 29 argument, presented at a hearing on March 13, 2019, is the alleged failure of the government to introduce evidence sufficient to satisfy the required elements of mail fraud with respect to the counts of conviction involving NECC's employment of Scott Connolly, a pharmacy technician who had lost his Massachusetts pharmacy license (Counts 48-56). The Connolly counts comprised nine out of Svirskiy's ten counts of conviction for mail fraud and nine out of the ten predicate acts underlying Svirskiy's racketeering conviction. Svirskiy also moves for acquittal on the two FDCA counts of conviction.

Rule 29 judgments of acquittal are granted sparingly. In deciding a Rule 29 motion, the court is to "scrutinize the evidence in the light most

compatible with the verdict, resolve all credibility disputes in the verdict's favor, and then reach a judgment about whether a rational jury could find guilt beyond a reasonable doubt." *United States* v. *Olbres*, 61 F.3d 967, 970 (1st Cir. 1995), quoting *United States* v. *Taylor*, 54 F.3d 967, 974 (1st Cir. 1995). "Under the viewpoint principle, a jury charged with determining an accused's guilt or innocence is entitled to consider the evidence as a seamless whole. . . . 'The sum of an evidentiary presentation may well be greater than its constituent parts.'" *Olbres,* 61 F.3d at 974, quoting *United States* v. *Ortiz*, 966 F.2d 707, 711 (1st Cir. 1992).

There are two facets to Svirskiy's mail fraud sufficiency of the evidence argument. The first focuses on the alleged lack of evidence establishing that he was a knowing participant in a scheme to defraud NECC's customers; the second on whether any material misrepresentations were made to NECC customers regarding the credentials of NECC's Clean Room staff, including Connolly. I will address each in turn.

That Svirskiy did not directly interact with any of NECC's customers is not a matter of genuine dispute. The hospitals and clinics that purchased NECC's drugs dealt only with the sales staff at Medical Sales Management (MSM), NECC's marketing arm, or occasionally, with Barry Cadden, NECC's Chief Pharmacist. Under the law, however, "a multi-member mail fraud is

3

itself treated like a conspiracy," *United States v. Yefsky*, 994 F.2d 885, 893 (1st Cir. 1993), and is subject to the same rules of imputed liability that apply in an ordinary conspiracy prosecution. Thus, the question is not whether Svirskiy made direct misrepresentations to customers but whether he was a knowing participant in a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses," 18 U.S.C. § 1341, and that the making of false pretenses was a reasonably foreseeable consequence of the scheme. *See United States v. Serrano*, 870 F.2d 1, 6-7 (1st Cir. 1989) ("The government need not prove that the defendant devised the fraudulent scheme; but it must prove 'willful participation in the scheme with knowledge of its fraudulent nature and with intent that these illicit objectives be achieved.'") (citation omitted).

Here, the evidence of Svirskiy's knowing participation in the scheme described in the indictment, while hardly overwhelming, was enough to satisfy the government-friendly Rule 29 standard. Scott Connolly testified that Svirskiy knew that he had surrendered his Massachusetts pharmacy license, and that Svirskiy had instructed him to conceal the fact that he was working in the Clean Room by falsely certifying his lab work using Barry Cadden's name and initials. S*ee* Trial Tr. at 157-158 (Oct. 26, 2018). The jury also heard that Svirskiy frequently used expired ingredients in filling

4

customer orders, did not properly test drugs before they were shipped, and that he instructed Connolly to do the same, *see* Trial Tr. at 27 (Oct. 29, 2018).[2]

When a defendant is shown to have been a knowing participant in a mail fraud scheme, he becomes liable for the foreseeable acts and deeds of his coventurers, including here, the misrepresentations made by members of the NECC sales team regarding the quality of NECC's drugs and its professed compliance with Massachusetts pharmacy regulations and United States Pharmacopeia (USP) 797 standards. This is true even when he is positioned at the outer orbit of the scheme. If the government can then prove that the misrepresentations were material, in the sense that they *could have influenced* the purchasing decisions of NECC's customers, the conviction will stand. *Cf. United States v. Prieto*, 812 F.3d 6, 13 (1st Cir. 2016) (The government "need not prove that the decisionmaker actually relied on the falsehood or that the falsehood led to actual damages.").

Ample evidence at trial established that NECC, in its promotional materials and sales pitches, touted to customers its strict compliance with Massachusetts law and regulations. Kenneth Boneau, an MSM sales

---

[2] *See, e.g.*, Ex. 289 (email from Svirskiy to Cadden stating "[w]e have 1.5KG (1kg containers) [of methotrexate powder] from spectrum . . . expired in 2007").

representative, testified that the representation that NECC's pharmacists and pharmacy technicians were fully licensed was a strong selling point to customers. Trial Tr. at 81-82 (Oct. 16, 2018). This was echoed by the purchasing agents who testified at trial. Deborah Faint, for example, the pharmacy buyer for Winchester Hospital in Winchester, Virginia, recalled assurances from NECC salespersons that all of NECC's pharmacy technicians were "licensed or registered in the state where they are practicing." *See* Trial Tr. at 23 (Nov. 5, 2018). Ralph McHatton, the Director of Pharmacy Operations at North Shore Medical Center in Salem, Massachusetts, testified that NECC's licensing compliance was "vital" to him as a purchaser and that he had been told that NECC's pharmacy staff "was licensed or registered or certified, whatever the requirements were by the state, prior to making the product." Trial Tr. at 17 (Nov. 8, 2018). Svirskiy's own conduct underscored the materiality of the licensing pretense: he would instruct Connolly to leave the Clean Room whenever state inspectors appeared or NECC customers visited, and instead pretend to be working as a stockman in the warehouse. *See* Trial Tr. at 162 (Oct. 26, 2018).

In an effort to impugn any causal connection between Connolly's unlicensed status and the purchasing decisions of NECC's customers, Svirskiy cites to *United States v. Berroa*, 856 F.3d 141 (1st Cir. 2017). In

*Berroa*, the defendants had fraudulently obtained medical licenses from the Puerto Rico Board of Medical Examiners by cheating on the qualifying examinations. The government, estopped by *Cleveland v. United States*, 531 U.S. 12, 18 (2000), from arguing that the fraudulent obtaining of a license deprived a government entity of "property" within the meaning of the mail fraud statute, instead charged the defendants with a scheme to "depriv[e] unsuspecting consumers of health care services, health care benefit programs and health care providers, of property and money through the defendant[s'] knowing[] use of [their] fraudulently obtained medical license[s]." *Berroa*, 856 F.3d at 149.

The First Circuit reversed the defendants' convictions, reasoning that the link between the defendants' having fraudulently obtained their medical licenses and their future treatment of patients was too attenuated to support the jury's verdict. *See id.* at 149-150 ("Here, the defendants' alleged fraud in obtaining their medical licenses cannot be said to have 'naturally induc[ed]' healthcare consumers to part with their money years later."), quoting *Loughrin v. United States*, 573 U.S. 351, 363 (2014). As the First Circuit noted, *Loughrin*'s "naturally inducing" test "evokes the familiar concept of proximate causation." *Berroa*, 856 F.3d at 149 n.4; *cf. Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339 (1928) (Cardozo, C.J.).

7

The testimony of Faint and McHatton satisfies this proximate cause standard. As I noted in ruling on a similar post-verdict motion in the Cadden case, "[t]he jury need only have been persuaded that a reasonable purchaser of NECC's drugs, if told that the drugs they were being offered had been compounded by an unlicensed technician, would have given weight to that fact in his or her purchasing decision." Mem. and Order on Def. Barry Cadden's Mot. for Acquittal, Dkt # 1135, at 11-12.

Svirskiy raises two additional arguments. First, he notes the wide variations among states in their licensing requirements for pharmacy technicians, including some like New York that have no requirements at all, and some like Massachusetts where the requirements are very strict. This disparity, he argues, undermines any notion that licensing compliance had a material bearing on purchasing decisions. Second, he maintains that since Connolly always had a national certification through the Pharmacy Technician Certification Board (PTCB), the representation that all NECC pharmacy technicians were "certified" was, in fact, true. Again, these contentions are refuted by McHatton's testimony that it would have been important to him that all NECC technicians were "licensed or registered or certified, whatever the requirements were by [Massachusetts], prior to making the product." Trial Tr. at 17 (Nov. 8, 2018). Moreover, the jury would

have been warranted in concluding that a reasonable buyer would have been given pause if told that NECC was employing a pharmacy technician who had surrendered his Massachusetts license in connection with a serious disciplinary matter, whatever his other credentials might have been. This has even more force because NECC's compounding operations were based exclusively in Massachusetts. The Rule 29 motion will therefore be denied as to the nine mail fraud counts.[3]

Svirskiy's contentions with respect to the FDCA counts also fail. The FDCA provides that "a drug or device shall be deemed to be adulterated" when, *inter alia*, "it has been prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health." 21 U.S.C. § 351(a)(2). The jury heard evidence that Svirskiy and others working in the Clean Room were aware that environmental testing was returning positive results for mold and bacteria before the outbreak, yet no meaningful remediation was undertaken

---

[3] Svirskiy also argues that the sole, non-Scott Connolly-related mail fraud count of conviction – the July 7, 2011 shipment of six 25 mg/ml methotrexate injectables to the University of Southern California Hospital in Los Angeles – must be vacated because the methotrexate tested as potent and sterile during the relevant time period. This argument sidesteps the fact that USP-797 flatly prohibits the use of expired ingredients in the compounding of drugs, while NECC's promotional materials claimed that NECC complied with and even exceeded the USP-797 standards. That the drugs in question may have been potent or sterile is beside the point.

as required by USP-797 and NECC's internal policies. No more is necessary to sustain the jury's verdict on the FDCA counts.

In the alternative, Svirskiy seeks a new trial under Fed. R. Crim. P. 33. A district court's power to order a new trial pursuant to Rule 33 is broader than its power to grant a motion for acquittal. *United States* v. *Rothrock,* 806 F.2d 318, 321 (1st Cir. 1986). The court may consider both the weight of the evidence and the credibility of the witnesses in deciding a motion for a new trial. *Id.* However, "[t]he remedy of a new trial is rarely used; it is warranted 'only where there would be a miscarriage of justice' or 'where the evidence preponderates heavily against the verdict.'" *United States* v. *Andrade*, 94 F.3d 9, 14 (1st Cir. 1996), quoting *United States* v. *Indelicato*, 611 F.2d 376, 386 (1st Cir. 1979).

Here, that extraordinary remedy is not warranted as Svirskiy's four theories for a new trial are not load bearing. His principal argument is that the court's decision to permit the government to introduce limited evidence of patient harm related to the fungal-contaminated MPA caused him undue prejudice. This was a matter of extensive discussion prior to the trial and resulted in an Order largely granting the defendants' motion in limine on the subject. *See* Dkt # 1495 (excluding evidence of patient harm except for the

limited purpose of informing the jury why federal investigators had descended *en masse* on NECC's premises in the fall of 2012).

Consistent with its ruling, the court explained to the jury at the outset of the trial why and for what purpose the government would be permitted to offer some evidence of the outbreak and the ensuing harm. Trial Tr. at 7-8 (Oct. 15, 2018). I further instructed the jury as follows:

> What I need you to keep in mind at all times is that none of these defendants are charged with any involvement in that batch of contaminated drugs, or batches as the case may be. What they are charged with is something entirely unrelated, in the sense that they [had] nothing, and are alleged to have [had] nothing, to do with the deaths or injuries.

*Id.* This instruction was repeated at various points throughout the trial. S*ee, e.g.*, Trial Tr. at 161 (Nov. 15, 2018) ("I've done this before, but I want to remind you that none of the defendants here have been charged with any involvement in the manufacture or compounding of the MPA that caused so much damage."). The isolated incidents that Svirskiy cites of witnesses referring to "the outbreak" or "victims of the outbreak," *see* Svirskiy Mem., Dkt # 1842 at 33, do not to my mind impeach the force of the court's cautionary instructions. While the issue was a delicate one, I am confident that the correct balance between the jury's right to know and the defendant's right not to be prejudiced by too much extraneous information was struck.

Svirskiy's remaining three grounds can be summarily addressed. First, he alleges that the court erred when it revised the FDCA component of the proposed instructions to explain to the jury that, in determining whether Svirskiy introduced adulterated drugs into interstate commerce with intent to defraud or mislead, "[t]he deceit must, however, be about something material, that is, something important that has a natural tendency to influence or at least is capable of influencing a customer or *a government regulator.*" Trial Tr. at 214 (Dec. 4, 2018) (emphasis added). The objection is to an interpretation of the FDCA to include government entities as potential victims. The short answer is that the case law is consistent with the court's interpretation. *See, e.g.*, *United States v. Arlen*, 947 F.2d 139, 143 (5th Cir. 1991); *United States v. Bradshaw*, 840 F.2d 871, 874 (8th Cir. 1988).[4] Next, Svirskiy objects to the court's refusal to admit evidence of the content of anti-Semitic insults directed at him by Barry Cadden and Glenn Chin, his supervisors and coconspirators. The court did allow substantial evidence that Svirskiy was treated badly by Chin and was often the butt of his

---

[4] There was ample evidence that the scheme included an effort to conceal NECC's activities from the Massachusetts Board of Pharmacy (MABOP). S*ee* Trial testimony of MABOP Samuel Penta regarding NECC's efforts to mislead MABOP (Nov. 15, 2018). Moreover, even were this error, there was considerable evidence that NECC's customers were the principal target of the scheme to deceive.

slurs and other insults. Beyond that, the court sees no reasonable purpose that would have been served by exposing the jury to Chin's anti-Semitic rants.[5] Finally, Svirskiy contends that the prosecution committed misconduct in its closing argument by stating that "of course [the defendants] knew that NECC was advertising itself as safe and as complying with Massachusetts pharmacy regulations. Why? Because they had to, to stay in operation; because that was the law that they were required to follow as pharmacists, that NECC was required to follow." Trial Tr. at 35 (Dec. 4, 2018). If it was error for the prosecutor to urge that a jury find a defendant guilty of the elements of a crime charged, there would be little point to permitting a closing argument.

ORDER

For the foregoing reasons, Svirskiy's motion for judgment of acquittal, or, alternatively, for a new trial is DENIED.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE

---

[5] Svirskiy also objects to the court's admission of testimony regarding horseplay, pranks, and other juvenile antics engaged in by the pharmacy technicians in the Clean Room, behavior in which Svirskiy regularly participated. That evidence, however, was relevant to the erosion of professional standards at NECC. The fact that it was unflattering to Svirskiy is not a reason to exclude it.